UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
                                                                        :
**UNITED STATES OF AMERICA**                                            :
                                                                        :        **08 CR 1327 (HB)**
           - against -                                                  :        **OPINION & ORDER**
                                                                        :
**VSEVOLOD BERKOLAYKO**                                                 :
                                                                        :
                        Defendant.                                      :
                                                                        :
------------------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

      Defendant Vsevolod Berkolayko ("Berkolayko") is one of seven defendants charged in a seven-count superseding indictment with, *inter alia*, conspiracy to violate the Hobbs Act, 18 U.S.C. §1951, in connection with attempts to hijack Federal Express tractor-trailer trucks on the west side of Manhattan. Berkolayko moves to suppress physical evidence, including a black pistol-like pellet gun and multiple rounds of ammunition, recovered by the Government pursuant to a search of an apartment in Brooklyn the day after his arrest. In his moving papers and at an evidentiary hearing held on August 5, 2009, Berkolayko has argued principally that the consent to search obtained by federal agents from a live-in nanny was neither voluntary nor authorized. For the following reasons Berkolayko's motion is DENIED.

## I.     FACTUAL BACKGROUND

After Berkolayko was named as a defendant in a superseding indictment and an arrest warrant issued, agents of the FBI conducted surveillance in an effort to locate and arrest him. Tr. of August 5, 2009 Hrg. ("Tr.") 5, 32. In the early evening of April 2, 2009, Berkolayko was arrested on the street as he exited a gambling club near East 8th Street and Avenue U in Brooklyn. Tr. 33-34. Berkolayko was then transported to the FBI office in Manhattan, and in the course of his processing after the arrest he told the agents that he lived in an apartment on Bragg Street in Brooklyn.[1] Tr. 5, 35. Berkolayko was then transferred to the Metropolitan Detention Center, where he has remained in custody since the date of his arrest. See Decl. of Vsevolod Berkolayko, dated May 19, 2009 ("Berkolayko Decl.") ¶ 2.

---

[1] The Court takes judicial notice of the fact that the distance between the site of Berkolayko's arrest on the corner of East 8th Street and Avenue U and the apartment on Bragg Street is less than two miles.

The following day, April 3, 2009, a team of FBI agents comprised of Special Agent Michael Zuk ("Zuk") and three other agents, travelled to the apartment on Bragg Street and knocked on the door. Tr. 7. The door to the apartment was opened by a woman, later identified as Chris Aiferman ("Aiferman"), and the agents immediately observed two small children eating at a table in the main room of the apartment. Tr. 7. Special Agent Zuk testified that the agents identified themselves and informed Aiferman that Berkolayko had been arrested. Tr. 8. Aiferman then informed the agents that the children were Berkolayko's and that she was the nanny who cared for them. Tr. 8. Zuk then informed Aiferman that Berkolayko had been arrested for a violent crime and that the evidence suggested he had possessed a weapon at the time of the offense. Tr. 8. Zuk testified that he explained to Aiferman that he hoped she would consent to a search of the apartment, in part because of the possibility that there was a weapon present in the apartment where the children were living. Tr. 8, 49. Aiferman told the agents they should get a warrant. Tr. 9. Zuk responded that he understood and that for purposes of his report he needed Aiferman's name and date of birth. Tr. 8-9. He also asked where she was from. Tr. 9. Aiferman responded that she was from Israel and that she had been in the country for three days on a tourist visa and had been living in the apartment as the nanny for the children since her arrival. Tr. 10. Zuk responded that he did not understand why, if she was in the country on a tourist visa, she was caring for the children instead of "doing anything seemingly related to tourism" and he informed Aiferman that he intended to call to Immigrations and Customs Enforcement ("ICE") to determine if she was in the country legally. Tr. 10-11, 13.

The agents left and went down to the lobby of the building where one of them placed the call to ICE. Tr. 11. At that time, Zuk spoke to a man who was working on the building and appeared to be the superintendant. Tr. 11. Zuk asked the man if he knew if a nanny lived in the apartment they had just visited and, if so, for how long she had lived there. Tr. 11. The man responded that he believed a nanny had been living there for more than a year.[2] Tr. 11-12. While the agents were waiting for a return phone call from ICE, they observed Aiferman, the two children, and an unidentified man hurriedly exiting the building through a back exit. Tr. 12.

The agents followed and caught up with Aiferman on the sidewalk. There they confronted her with the fact that her story did not make sense and appeared to have been

---

[2] It turns out that the building superintendant likely assumed that the agents were speaking about Aiferman's mother, who had resided in the apartment as a nanny until Aiferman took over the role three days prior to the date of the agents' search. See Tr. 48.

contradicted by the building superintendant; the agents stated further that they believed she had lied to them about her immigration status.  Tr. 13, 53-55.  Zuk testified that Aiferman became angry and confrontational and disputed his account of what she had said earlier.  Tr. 14.  Zuk asked her to wait while the agents waited for the return call from ICE, and Aiferman then volunteered that she had been in the country for ten years and that she was unaware of her immigration status.  Tr. 14.  Aiferman remained confrontational and when she refused to adhere to the agents' request that she stay put, the agents handcuffed her and placed her in the back seat of their nearby S.U.V. with the door open.[3]  Tr. 15.  Zuk testified that the agents placed Aiferman in the vehicle to save her the embarrassment of being handcuffed on the street in front of her home and because it was lightly raining at the time.  Tr. 15-16.

      Zuk further testified that once she was seated in the vehicle, Aiferman's demeanor changed dramatically:  she became soft spoken and polite and immediately apologized for initially providing false information to the agents.  Tr. 16.  According to Zuk's testimony, Aiferman stated that the only reason she had refused consent to search was because the children were in the apartment and that she did not want them to be frightened.  Tr. 16.  Aiferman told the agents that she had lived in the apartment for three days and two nights and that her mother had previously been the nanny for Berkolayko's children.  Tr. 18.  Aiferman indicated that she had moved all of her belongings into the apartment and had an agreement with Berkolayko whereby she would live in the apartment rent free in exchange for taking care of the children.  Tr. 18-19; 63.  Aiferman also said that she intended to remain in the apartment indefinitely.  Aiferman told the agents that she was the primary caregiver for the children—she fed them, clothed them, and cared for them at night—and that Berkolayko did not reside in the apartment but would sleep there once or twice a week on the couch in the living room.  Tr. 25, 48.

      As the agents continued to wait for the return phone call, Aiferman repeatedly offered to consent to a search and Zuk ultimately agreed.  Aiferman signed a consent to search form and led the agents back to the apartment, letting them in with her own key.  Tr. 17-19.  In the apartment Aiferman pointed out her own belongings to the agents which included her clothing and pets, including a cat, a rabbit and fish in an aquarium in the corner of the living room.  According to

---

[3] The male who had accompanied Aiferman out of the building had been allowed to walk the children down to the end of the block as the agents questioned Aiferman.

3

Zuk's testimony, the presence of Aiferman's belongings corroborated for the agents that she in fact lived there. Tr. 25.

The apartment was small and its one bedroom appeared to be occupied by the children, based upon the way it was decorated and Aiferman's statement that it was they who slept there. Tr. 26.  In the living room was a closet that was separated from the room with a curtain, but no door.  In it, were men's clothes as well as items that appeared to belong to a woman or a child. Tr. 61; *see also* GX 3C, D. After moving some of the clothes out of the way, the agents recovered number of items of evidence that Berkolayko seeks to suppress here, including a starter pistol and plastic zip ties. Tr. 23, 59.  During the course of the search, Zuk neither asked, nor did Aiferman volunteer, whether she had been instructed not to enter certain areas of the apartment.  Tr. 63.

In a declaration submitted in support of his motion to suppress, Berkolayko declares that he is the lessee of the apartment in which his two daughters, ages 3 and 5, reside.  Berkolayko Decl. ¶3.  Berkolayko further declares that Chris Aiferman's mother, Tonya Aiferman, is the nanny for his children, that on the date of the search Chris Aiferman was temporarily substituting for her mother and that she did not have his authority to consent to a search of the apartment. Id. at ¶¶ 3-6.

## II. DISCUSSION

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated ...." U.S. CONST. AM. IV.  A warrantless search is *per se* unreasonable unless one of a "'few specifically established and well-delineated exceptions" applies.  Moore v. Andreno, 505 F.3d 203, 208 (2d Cir. 2007) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)).  A warrantless search conducted pursuant to valid consent is a well-established exception to the general prohibition on warrantless searches. See United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995) (citing Schneckloth, 412 U.S. at 219)).  To determine whether the search of Berkolayko's apartment was made pursuant to valid consent, I must decide two issues: first, whether Aiferman voluntarily provided the agents with consent to search the apartment and, second, whether she had either actual or apparent authority to do so.

**A. Aiferman's Consent was Voluntary**

The Government bears the burden of proving, by a preponderance of the evidence, that the agents had a reasonable belief that Aiferman's consent to search was voluntary. United States v. Isofia, 370 F.3d 226, 230-31 (2d Cir. 2004) (citing United States v. Calvente, 722 F.2 1019, 1023 (2d Cir. 1983)). This is a "question of fact to be determined by the 'totality of all the circumstances.'" United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993) (quoting Schneckloth, 412 U.S. at 227). "Consent must be a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority."[4] Id. (internal citations omitted). "[K]nowledge of the right to refuse consent is not a requirement of a finding of voluntariness, though it may be a factor in ascertaining whether the consent was coerced." United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995) (citing United States v. Kon Yu-Leung, 910 F.2d 33, 40-41 (2d Cir. 1990)). A voluntary consent may follow formal arrest or detention, United States v. Watson, 423 U.S. 411, 424 (1976); United States v. Moreno, 897 F.2d 26, 33 (2d Cir.), cert denied 497 U.S. 1009 (1990), and an individual who is lawfully restrained need not be advised that she is "'free to go'" before [her] consent to search will be recognized as voluntary. Ohio v. Robinette, 519 U.S. 33, 35 (1996). However, when the person providing consent is "seized" the voluntariness of the consent requires "more careful scrutiny." United States v. Ozsusamlar, 278 Fed.Appx. 75, 76-77 (2d Cir. 2008) (citing United States v. Puglisi, 790 F.2d 240, 243 (2d Cir. 1986).

On the record established at the suppression hearing, I conclude that the agents had a reasonable basis to believe that Aiferman voluntarily consented to the search of the apartment. There is no dispute that when the agents caught up with Aiferman on the street they confronted her and told her that her story did not add up. Zuk acknowledged that he accused Aiferman of lying to him and handcuffed her and put her in the back of their vehicle while they waited for the return call from ICE. According to the testimony, it was at this point that Aiferman's demeanor changed markedly and she repeatedly and of her own accord advised the agents that she would

---

[4] "The concept of a knowing and intelligent waiver, which is strictly applied to rights involving a fair criminal trial does not govern in the Fourth Amendment context . . . because the Fourth Amendment prohibits not all searches and seizures, but only those that are 'unreasonable.'" Garcia, 56 F.3d at 422 (citing Illinois v. Rodriguez, 497 U.S. 177, 183 (1990) (internal citations omitted). Thus, a consent to search must be "voluntary" but it need not be "knowing" and "intelligent" in the same way that, for example, a defendant's waiver of his trial counsel's conflicts must be. See, e.g., United States v. Curcio, 680 F.2d 881, 885 (2d Cir. 1982).

consent to a search of the apartment. Berkolayko argues that Aiferman's consent could not possibly have been voluntary under these circumstances, but the case law dictates a contrary conclusion.[5] For example, in Kon Yu-Leung, 910 F.2d at 40-41, the Second Circuit affirmed the voluntariness of consent provided by a handcuffed suspect to six law enforcement officers who entered his home in the early morning hours and who assured him that if he refused to consent to a search they would remain there until a warrant was obtained. See also, United States v. Ansaldi, 372 F.3d 118, 129 (2d Cir. 2004) (holding that use of guns to effectuate arrest and handcuffing of defendant did not render his consent to search his home involuntary); United States v. Crespo, 834 F.2d 267, 271 (2d Cir. 1987) (affirming district court's finding that consent to search was voluntary after law enforcement agents broke down defendant's door and placed him under arrest in handcuffs); but see, United States v. Isofia, 02 Cr. 520 (HB), 2003 WL 21018853, (S.D.N.Y. May 5, 2003), aff'd. United States v. Isofia, 370 F.3d 226 (2d Cir. 2004) (finding involuntary consent offered only minutes after police made an illegal entry into the home of a suspect who was not a native English-speaker and who was not advised of the charges against him, the type of evidence sought, or his right to refuse consent). Here, Zuk testified that after Aiferman was placed in the car and the handcuffs removed she became "very soft spoken, very polite, congenial even." Tr. 16. According to Zuk's testimony Aiferman apologized for initially lying to the agents and explained she was only interested in protecting the children and believed that if she had been truthful the agents would have caused the agents to stay longer and to frighten the children. Tr. 16. The testimony indicates that Zuk only decided to act on the consent Aiferman offered—again, of her own accord—after she repeated herself several times. Tr. 17-18. Finally, the testimony and evidence confirm that Aiferman agreed to sign a written consent to search form, further indication that her consent was reasoned and deliberate as opposed to hastily proffered in acquiescence to the agents' show of authority.

---

[5] At the suppression hearing, Berkolayko's counsel also argued that the most "troubling" aspect of the search was the agent's failure to obtain either Berkolayko's consent to search the apartment or a warrant to do so. While the better course may have been, since Berkolayko was available, to have sought his consent, the law is clear that the agents were under no obligation to do so or to obtain a warrant, so long as they received valid consent to search from someone. See United States v. Lopez, 547 F.3d 397, 399-400 (2d Cir. 2008) ("[L]aw enforcement officers are under no affirmative obligation to request consent from a potentially objecting co-occupant before acting on permission they received from another occupant.") (citing Georgia v. Randolph, 547 U.S. 103, 111 (2006)); Garcia, 56 F.3d at 424 ("[W]e perceive no significant connection between the failure of the officers to obtain a search warrant in this case and the issue whether they reasonably believed that Garcia had consented to their entering his apartment.")

Unlike the consent to search I found to be involuntary in Isofia, the consent here did not follow an illegal entry or other illegal law enforcement conduct. See Isofia, 2003 WL 21018853. I reach this conclusion after applying the more "careful scrutiny" that is warranted by the fact that Aiferman was "seized" at the time she provided consent and fully cognizant that the agents had accused her of lying to them.  There is, however, no indication that the agents offered Aiferman a quid pro quo or suggested that if she consented to the search they would disregard her earlier untruthfulness or her immigration status.  Although they did detain her, the agents neither threatened nor intimidated Aiferman and I therefore conclude that the consent she provided was voluntary.  United States v. London, 148 Fed.Appx. 19, 22 (2d Cir. 2005) ("There was no outright deception, no intimidation or coercion of any sort, and thus no basis to think that [the defendant's] consent was involuntary.")

### B. Aiferman Had Apparent, If Not Actual, Authority to Consent to the Search

Having determined that Aiferman's consent to search was voluntarily given, I now must determine whether she had actual or apparent authority to provide such consent.  A warrantless search is lawful if conducted pursuant to the voluntary consent of a third party with "common authority over or other sufficient relationship to the premises." United States v. McGee, 564 F.3d 136, 138-39 (2d Cir. 2009) (quoting United States v. Matlock, 415 U.S. 164, 171 (1974)).   Thus, the Second Circuit has held that third party consent validates a search where "(1) the third party had access to the area searched and (2) either (a) common authority over the area, (b) a substantial interest in the area, or (c) permission to gain access." McGee, 564 F.3d at 138-39 (quoting United States v. Davis, 967 F.2d 84 (2d Cir. 1992)).  At root, authority to consent to a search

> does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

Matlock, 415 U.S. at 171 n. 7.   As recently explained by the Supreme Court in Georgia v. Randolph, "[t]he constant element in assessing Fourth Amendment reasonableness in the consent cases, then, is the great significance given to widely shared social expectations."  547 U.S. 103, 111 (2006).

Pairing the importance of "widely shared social expectations" with the rule of apparent authority establishes the legal principles applicable here.  Under the rule of apparent authority,

7

"[e]ven if the person giving consent in fact lacked authority to do so, consent "may nonetheless validate the search if the person reasonably appeared to the police to possess authority to consent to the search." McGee, 564 F.3d at 139.  In Matlock, the co-occupant could validly consent to a search of a home and bedroom that she shared with the criminal defendant who sought to invalidate the search. Matlock, 415 U.S. at 171; see also McGee, 564 F.3d at 141 (co-occupant had "access" to house, and thus authority to consent to a search thereof, because she resided there, notwithstanding that she had been locked out by the defendant).  Concomitantly, it is objectively reasonable for an officer to belief that one who answers the door "with a baby at her hip" has authority to consent to a search of that home. Randolph, 547 U.S. at 112 (discussing Matlock, 415 U.S. at 171).

   Here, the factual record developed at the suppression hearing makes clear that Aiferman had, at a minimum, apparent authority to consent to the search of the apartment, including the closet in the living room where the starter pistol and other evidence was found.  Although Aiferman had only recently moved into the apartment, she told the agents she was the primary caregiver for the children, lived in the apartment full time, and intended to continue to do so indefinitely.  The agents' observations corroborated this account: they observed the children eating a meal when they first approached the door, they were let in to the apartment by Aiferman who had her own key, and in the apartment they observed personal belongings that Aiferman pointed out as her own.  See e.g., U.S. v. Gambina, 122 F.3d 1058 (2d Cir. 1997) (defendant's sister who had keys to his apartment, stayed there occasionally, and kept belongings there had apparent authority to consent to search).  What is more, the type of belongings Aiferman moved into the apartment clearly suggested that she was more than a temporary babysitter; she moved a cat and a rabbit into the apartment as well as an aquarium that was up and running when the agents entered the home.  See Tr. 19; GX-3A, B.  Irrespective of the veracity of Berkolayko's declaration that Aiferman did not, in fact, possess authority to consent to a search of the apartment, it is clear that, at a minimum, the agents were reasonable to believe that she did have such authority.

   Finally, there is no indication that any area or enclosure within the apartment was "off limits" to Aiferman, who was the primary caregiver for the children.  There is no evidence in the record that suggests an equivalent to the locked room in Moore or the hypothetical locked

suitcase discussed in Randolph,[6] *i.e.* a private, enclosed space that the agents should have recognized to be beyond the scope of the live-in nanny's common authority or rights of access. Indeed, the testimony established that much of the evidence was recovered from a closet that contained men's clothing as well as items that appeared to belong to either the children or to Aiferman. See Tr. 61; GX-C. Zuk testified that this closet was separated from the living room only by a curtain and that the other closets were open to the apartment. Tr. 64._Because dressing the children was within Aiferman's job description, it was reasonable for the agents to believe that Aiferman's right of access extended to the closet where the children's belongings were stored.–In sum, based upon all of the facts known to the agents at the time of the search, it was objectively reasonable for them to conclude that Aiferman had authority to consent to a search of the apartment, including locations from which the evidence sought to be suppressed was recovered.

### III. CONCLUSION

For the foregoing reasons, Berkolayko's motion to suppress the physical evidence recovered from the search of his apartment on Bragg Street on April 3, 2009 is DENIED. The Clerk of the Court is instructed to close this motion.

SO ORDERED
September  , 2009
New York, New York

_____
U.S.D.J.

---

[6] Randolph, 547 U.S. at 135 (Roberts, C.J. dissenting) ("a person [who] wants to ensure that his possessions will be subject to a consent search only due to his *own* consent, ... [may] place these items in an area over which others do *not* share access and control, [like] a private room or a locked suitcase under a bed.")

9